IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANTWAN SMITH                         :

                                 :

    v.                           :   Civil Action No. DKC 24-513

                                 :

FORMAN MILLS                         :

                                 :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case brought by *pro se* Plaintiff Antwan Smith ("Plaintiff") is the motion to dismiss filed by Defendant Forman Mills, Inc. ("Defendant"). (ECF No. 26). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be granted in part and denied in part.

**I.   Background[1]**

In May 2022, Plaintiff, "a middle-aged black man" was employed by Defendant as a "Loss Prevention Associate." (ECF No. 25, at 5).[2] It is unclear what the precise responsibilities of this position were, but Plaintiff alleges that "[t]he expectation for this role was to partner with the store team to share informa[ti]on

---

[1] The following facts are set forth in the amended complaint and construed in the light most favorable to Plaintiff.

[2] Forman Mills operates discount department stores. Plaintiff worked at the store in Forestville, Maryland. (ECF No. 25, at 3).

regarding how to minimize shrinkage through various programs with some of them changed before being hired." (ECF No. 25, at 5). Plaintiff was interviewed by Dennis McDavid ("Dennis"),[3] and Dennis shared that "there were issues with prior [Loss Prevention Associates] and this store manager." (ECF No. 25, at 7). Training for the Loss Prevention Associates usually takes around thirty days, but because of Plaintiff's "proficiency in the subject," he only had to train for two weeks. (*Id.*). Plaintiff seems to suggest that others knew that the store manager was difficult to work with because, during the training, Plaintiff was wished "'good luck' because the store manager is this, the store manager is that, etc." (*Id.*).

When Plaintiff first started his job, the store manager was on vacation. (*Id.*). Plaintiff worked with the assistant store manager, who "immediately showed that she did not want to interact with [Plaintiff]." (*Id.*). When Plaintiff accidentally gave her the wrong key, the assistant store manager told him that he could not "ask her for anything because she wasn't going to help." (*Id.*). "Red [f]lags went up after that comment," and Plaintiff shared his concerns with the store manager when he returned.

---

[3] Later in the amended complaint, Plaintiff states that the district corporate leaders were "Shawn and Dennis." (ECF No. 25, at 7). Presumably, Dennis is the same individual who interviewed Plaintiff.

(*Id.*).    Additionally, on June 10, 2022, Plaintiff emailed the district's corporate leaders, Shawn and Dennis, regarding his concerns.    (*Id.*).    Shawn replied and said, "he would be in the store to ensure we worked together," and "that the team is off to a wrong start."    (*Id.*).

On or about July 3, 2022, Plaintiff emailed the corporate leaders and the store manager about culture and management that related to a discussion Plaintiff had just had with the store manager.    (ECF No. 25, at 8).    "This appeared to infuriate" the store manager, and after that, "it was never easy for [Plaintiff] to communicate with the store [manager] or assistant manager." (*Id.*).    The manager told Plaintiff "that he prefers to take care of things 'in-house' and that he did not like Shawn or Dennis coming to the store [to] 'check[]' on him."    (*Id.*).    Plaintiff seems to allege that following this encounter, Plaintiff had difficulty inputting his schedule.    (*Id.*).    The schedule information had to be entered into Excel, but "it was often put in wrong."    (*Id.*).    Plaintiff had the store manager or assistant manager fix the information, but "it did not stop a triggering alert to [his] supervisor regarding time and attendance."    (*Id.*). Plaintiff "then started having team members tell [him] more often

that Melvin and/or Kamou[4] said they could not talk to [him]." (*Id.*).  Dennis would call Plaintiff to ask "about the various things the store manager said [he] was doing."  (*Id.*).  Plaintiff explained what the situation was, and Plaintiff "was told to continue doing what [he was] do[ing] and communicate with [Dennis] whenever things go south."  (*Id.*).

Later in July, the store manager confronted Plaintiff about "a process that had just been changed a few days prior to [Plaintiff] being off for a couple days."  (*Id.*).  The store manager "prefabricated" a story to Gloria Segal, the HR director at the time, that Plaintiff refused to "sign the write up."  (*Id.*).  On or about August 16, 2022, Dennis contacted Plaintiff about the incident, and Plaintiff stated he did not know anything about it.  (*Id.*).  Plaintiff told Dennis to check the store cameras, and Dennis realized that the store manager did not accurately report the incident to HR.  (ECF No. 25, at 8-9).

In his Equal Employment Opportunity Commission ("EEOC") charge of discrimination, Plaintiff writes that he was subjected to "exclusion and denial of working with staff," "false write ups," and "notes criticizing [his] performance."  (ECF No. 25-1, at 2).

---

[4] Plaintiff does not provide the last names or positions of these individuals.

4

Although Plaintiff was supposed to have weekly meetings "to discuss observations, potential changes in policy/processes prior to any information being sent down to the rest of the store team," "[t]he store manager refused to work with [Plaintiff] and would find ways to 'forget' about [their] scheduled meeting." (ECF No. 25, at 9). Plaintiff alleges that the situation "got so bad that Shawn and Dennis required the meeting notes to be disseminated" before the meetings. (*Id.*). The lack of cooperation from the store manager and the assistant manager impacted Plaintiff's ability to complete his tasks. (*Id.*). Throughout this time, Plaintiff continued to email Shawn and Dennis "regarding several issues dealing with the store management team." (*Id.*). In September and October 2022, Plaintiff complained about the "morale" in the store. (*Id.*).

In October 2022, Plaintiff emailed Dennis that he could not trust the store manager because the manager was "interfering with [Plaintiff's] internal investigations" by notifying the individuals being investigated, or terminating them before Plaintiff completed his investigations. (*Id.*). Dennis told Plaintiff that they would "circle back to it," but they never did. (*Id.*). Plaintiff also sent emails regarding "the culture, morale, and other processes in the store." (*Id.*).

In November 2022, Plaintiff emailed Dennis, Shawn, and HR regarding "issues that [Plaintiff] thought would cause the company a lawsuit." (ECF No. 25, at 10). Plaintiff complained that the store manager's hiring practices "were off[,] and his treatment of the team, . . . includ[ing] [Plaintiff], created a high turnover and the discrimination of individuals with special needs that could meet the needs of the business." (*Id.*). Dennis thanked Plaintiff for bringing up these issues, but the issues did not improve. (*Id.*). Additionally, the assistant store manager would "speak rudely and aggressively" to Plaintiff and tried to find problems with him and report it to the store manager to try and get Plaintiff terminated.[5] (*Id.*).

Plaintiff would "speak with [his] domestic partner to relieve the stress from working in this environment." (*Id.*). Plaintiff's partner would encourage Plaintiff to leave, but Plaintiff "was content that Dennis was honest and trustworthy to follow-up" on his November 2022 email. (*Id.*).

Plaintiff alleges that despite the strained relationship between himself and the store manager, Plaintiff remained professional and courteous. (ECF No. 25, at 11). The store

---

[5] Plaintiff also states that he "would express this with black shirts to not act unprofessional when it came to interacting with the store and assistant manager." (ECF No. 25, at 10). It is unclear what Plaintiff means by this.

manager, however, "undermined everything [Plaintiff] was responsible for, especially when it came to internal investigations." (*Id.*). The store manager would state that the HR director "had his back and wasn't worried about anything." (*Id.*). Subsequently, Plaintiff was "accused of discussing confidential information with employees." (*Id.*).

In March 2023, Plaintiff went on vacation, and when he returned, Dennis offered Plaintiff the opportunity to work in other stores. (*Id.*). Plaintiff did so, and when he returned to his home store, the store manager and the assistant manager were "more stand-off-ish and continued to be forced to interact" with Plaintiff. (*Id.*). Plaintiff emailed Dennis stating that he was "forced to file a complaint with the EEOC due to the hostile environment." (*Id.*). Dennis offered to change Plaintiff's store temporarily, but Plaintiff declined the offer "because the store manager would continue his discriminatory behavior, and the new [Loss Prevention Associate] would have to go through everything [Plaintiff] went through." (ECF No. 25, at 11-12). Plaintiff seems to allege that he told Dennis he should stay in the store to supervise the store manager, but Dennis and Shawn did not do so. (ECF No. 25, at 12).

Throughout April, May, and June, the situation did not change, and in late June, Plaintiff mailed his complaint to the EEOC.

(*Id.*).    The next day, Dennis and Shawn called a meeting for Plaintiff and the store manager.    (*Id.*).    Shawn asked the store manager: "how can we get this thing to work?", and the store manager replied: "[i]t can't. I will not work with him." (*Id.*). On July 16, Dennis visited Plaintiff in Plaintiff's office and told Plaintiff he was being terminated. (*Id.*).

In his amended complaint, in response to the form question of when he filed a charge with the EEOC, Plaintiff responded that he first drafted a letter on June 27, 2023,[6] "and with a counselor on or around November 6, 2023." (ECF No. 25, at 5).    Plaintiff also wrote that he received a right to sue notice from the EEOC ("Notice") on November 21, 2023.    (*Id.*).    Plaintiff later asserts that he accessed the documents on November 23, 2023.    (ECF No. 28, at 2).

On February 21, 2024, Plaintiff filed a complaint against Defendant for employment discrimination.    (ECF No. 1, at 4).    On July 3, 2024, Defendant filed a motion to dismiss.    (ECF No. 11). On September 20, 2024, Plaintiff filed a motion to amend his complaint, and the court granted his motion.    (ECF Nos. 22, 24). On October 4, 2024, Plaintiff filed an amended complaint for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

---

[6] In Plaintiff's opposition, he states that he mailed the complaint on or about June 28, 2023.    (ECF No. 28, at 1).

8

§§ 2000e-2000e17 ("Title VII") and the Maryland Fair Employment Practices Act, Md. Code Ann. State Gov't § 20-606(f)(2) ("MFEPA"). (ECF No. 25). On October 18, 2024, Defendant filed a motion to dismiss Plaintiff's amended complaint for failure to state a claim. (ECF No. 26). On November 13, 2024, Plaintiff filed a response in opposition. (ECF No. 28). On November 27, 2024, Defendant filed a reply in support of its motion to dismiss. (ECF No. 29).

## II. Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). The court "must accept the complaint's factual allegations as true and construe the facts in the light most favorable to the plaintiff." *Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 469 (4th Cir. 2025) (citing *Barbour v. Garland*, 105 F.4th 579, 589 (4th Cir. 2024)). A plaintiff's complaint must only satisfy the standard of Rule 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed.R.Civ.P. 8(a)(2)). A Rule 8(a)(2) "showing" requires

"stat[ing] a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Mays v. Sprinkle*, 992 F.3d 295, 299-300 (4th Cir. 2021) (quoting *Iqbal*, 556 U.S. at 663).

*Pro se* complaints must be construed liberally and must be "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "The mandated liberal construction afforded to *pro se* pleadings means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so[.]" *Carmax Auto Superstores, Inc. v. Sibley*, 194 F.Supp.3d 392, 401 (D.Md. 2016), *aff'd*, 730 F.App'x 174 (4th Cir. 2018). Despite this liberal construction requirement, however, "[p]rinciples requiring generous construction of *pro se* complaints are not . . . without limits." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). A plaintiff's *pro se* status neither excuses him of his obligation to state a plausible claim nor transforms the court into his advocate. *See Thomas v. Salvation Army S. Territory*, 841 F.3d 632, 637 (4th Cir. 2016); *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990). When "it appears 'beyond doubt that the plaintiff can prove no set

of facts in support of [their] claim which would entitle [them] to relief[,]'" dismissal of a *pro se* complaint is appropriate. *See Haines v. Kerner*, 404 U.S. 519, 521 (1972) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

## III. Analysis

### A. Timeliness of the Complaint

Defendant argues that Plaintiff's Title VII claims should be dismissed because he failed to file suit within ninety days of his receipt of his Notice. (ECF No. 26-1, at 4-5). Defendant asserts that the EEOC issued the Notice on November 21, 2023, and Plaintiff has alleged that he received the Notice that same day. (ECF No. 26-1, at 5). Plaintiff filed his initial complaint on February 21, 2024, more than ninety days later.

The EEOC Notice of Right to Sue is dated November 21, 2023.[7] (ECF No. 25-1, at 1). Plaintiff's original complaint recited that

---

[7] The record does not reflect how the notice was sent to Plaintiff, but, based on Plaintiff's discussion of his ability to view the notice, one can discern that the notice was sent through some sort of electronic means and not physically through traditional mail. (ECF No. 28, at 2). The EEOC has used various iterations of electronic notification to inform plaintiffs of their right to sue notices. *See, e.g.*, *Jacobs v. Walmart Inc.*, No. 22-CV-2666-RDB, 2023 WL 4532822, at *4-5 (D.Md. July 13, 2023) (stating that the EEOC sent the notice via email); *Abraham v. Trident Vantage Sys., LLC*, No. 23-CV-3195-TDC, 2024 WL 4607967, at *4 (D.Md. Oct. 28, 2024) (stating that the EEOC sent an initial email informing the plaintiff that a right to sue notice was available through the EEOC portal, and then the EEOC later sent additional emails with the notice attached to the email); *Pitts v. Baltimore Police Dep't*, No. 22-CV-1404-RDB, 2023 WL 3158705, at

he received the Notice on November 23, 2023. (ECF No. 1, at 6).
The amended complaint recites November 21, 2023, as the date of
receipt. (ECF No. 25, at 5). Plaintiff states in his opposition
that although the document is dated November 21, he did not
view/access it until November 23. (ECF No. 28, at 2). He filed
his complaint on the ninetieth day after accessing the Notice,
February 21, 2024. (*Id.*).

Defendant argues that Plaintiff cannot amend his allegations
through his opposition by stating in the amended complaint that he
received the Notice on November 21, 2023, and then stating in his
opposition that he only accessed the Notice on November 23, 2023.[8]

> To assert a cause of action under Title VII,
> "an aggrieved person [must] file a civil
> action within 90 days of receiving a right-
> to-sue letter from the EEOC." *Quinn v. Copart
> of Connecticut, Inc.*, 791 F.App'x 393, 395 (4th
> Cir. 2019) (citing 42 U.S.C. § 2000e-5(f)(1));
> *see also* 29 C.F.R. § 1601.28(e)(1) (requiring
> an aggrieved person to file an ADA action
> within 90 days of receiving a right-to-sue
> letter).

*Plummer v. MGM Nat'l Harbor, LLC*, No. 23-CV-592-DKC, 2024 WL
1156409, at *3 (D.Md. Mar. 18, 2024).

---

*3-4 (D.Md. Apr. 28, 2023) (writing that the EEOC issued the notice
through the EEOC electronic portal, and then later mailed the
notice to the plaintiff).

[8] Defendant writes "November 23, 2024," but this appears to
be a typographical error because Plaintiff wrote he accessed the
Notice on November 23, 2023. (ECF Nos. 28, at 2; 29, at 3).

Plaintiff's Notice states that "your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice. Receipt generally occurs on the date that you (or your representative) view this document." (ECF No. 25-1, at 1). Plaintiff's form amended complaint asks whether Plaintiff received a Notice of Right to Sue letter, and if so, on what date. Plaintiff checked the box confirming he received the Notice, and he wrote he received it on "11/21/2023." (ECF No. 25, at 5). It is unclear whether Plaintiff meant he received the Notice under the Notice's definition of receipt, meaning, he *accessed* the Notice on November 21, 2023.

> The Fourth Circuit has "explicitly recognized that the 90-day requirement is 'in the nature of a statute-of-limitations defense.'" *Quinn*, 791 F.App'x at 395 (quoting *Laber v. Harvey*, 438 F.3d 404, 429 n.25 (4th Cir. 2006)). The ninety-day period is not jurisdictional, but instead is treated as a statute of limitations period. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 398 (1982); *see also Quinn*, 791 F.App'x at 395 ("[A] Title VII claimant who fails to file a complaint within the 90-day period generally forfeits his right to pursue his [or her] claims."); *Fisher v. Maryland Dep't of Hous. & Cmty. Dev.*, 32 F.Supp.2d 257, 264 (D.Md. 1998), *aff'd*, 166 F.3d 1208 (4th Cir. 1998) ("Courts have interpreted this provision as a statute of limitations, and held that failure to file suit within ninety days after receipt of a notice from the EEOC renders a plaintiff's action untimely.").

*Plummer*, 2024 WL 1156409, at *3. The statute of limitations is an affirmative defense that must be pleaded and proved by the defendant. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir.

2007) (citations omitted).  It is only appropriate to resolve the issue on a motion to dismiss if the issue clearly appears on the face of the complaint and there are no factual disputes.  *See id.* (citations omitted).

In his opposition, Plaintiff asserts that he only accessed the Notice on November 23, 2023.  (ECF No. 28, at 2).  That is the date Plaintiff included in his original complaint.  The Notice defines "receipt" to include "view."  Under that formulation, Plaintiff only "received" the notice on November 23, 2023, when he viewed it, and he filed his initial complaint on the ninetieth day, February 21, 2024.  Because the ninety-day requirement is not jurisdictional, Plaintiff is not required to plead that he filed his complaint within ninety days, and at this motion to dismiss stage, it is enough that Plaintiff explains the timeline in his opposition.  Plaintiff's Title VII claims will not be dismissed as untimely.

**B. Title VII Claims**

Plaintiff alleges that Defendant violated Title VII for discriminatory termination, retaliation, and failing to prevent a hostile work environment.  (ECF No. 25, at 4).  Defendant argues that Plaintiff has failed to state a claim for each of these claims.  (ECF No. 26-1, at 5).

14

### 1.    Title VII Termination

Defendant argues that Plaintiff fails to state a claim for discriminatory termination because Plaintiff fails to allege that he was discriminated against because of his membership in a protected class.  (ECF No. 26-1, at 6).  Additionally, Plaintiff fails to allege his job performance was satisfactory at the time of his termination, and he even acknowledges that he was told he was "terminated because of [his] attendance, sharing of confidential information and the lack of partnership with the store management team."  (ECF No. 26-1, at 7).  Defendant also argues that the only adverse employment action Plaintiff alleges is his termination.  (*Id.*).  Defendant argues that Plaintiff fails to allege that his termination was motivated by bias or discrimination, that his position was filled with an applicant outside of Plaintiff's protected class, or that similarly situated employees outside of his protected class were treated more favorably.  (ECF No. 26-1, at 8).

Plaintiff asserts that as "a middle-aged, outspoken African American male," he is a member of a protected class.  (ECF No. 28, at 3).  Seemingly in an effort to show that he was performing his job satisfactorily when he was terminated, Plaintiff argues that "Defendant used different events months apart from Plaintiff's employment to terminate him.  [Defendant] cannot draw a clear

connection between those instances in which disciplinary actions had to be taken due to [Plaintiff's] inability to conform with company policy or major violation occurred thereof." (ECF No. 28, at 3). Additionally, Plaintiff argues that "the treatment and experiences the Plaintiff received . . . shows the court that those events and the reporting of several rule violations establishes a clear nexus that the company not only wrongfully terminated Plaintiff but attempts to show that they failed to abide by their own disciplinary policy." (ECF No. 28, at 3).

Title VII prohibits employers from "fail[ing] or refus[ing] to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Because Plaintiff has not alleged any facts of direct discrimination, Plaintiff must proceed under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

> To establish a discriminatory termination claim, a plaintiff must make a prima facie showing that: (1) he was a member of a protected class; (2) he was satisfactorily performing his job at the time of the termination; (3) he was terminated from his employment; and (4) the prohibited conduct in which he engaged was comparable in seriousness to misconduct of other employees outside the

> protected class who received less severe
> discipline.

*Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (citing *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011)).

> At the current motion to dismiss stage,
> Plaintiff does not need to allege "specific
> facts establishing a prima facie case of
> discrimination[.]" *Westmoreland v. Prince
> George's Cnty.*, Civ. No. 09-2453-AW, 2010 WL
> 3369169, at *3 (D.Md. Aug. 23, 2010) (quoting
> *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506,
> 508 (2002)). Instead, Plaintiff must only
> "plausibly allege" that an adverse action
> occurred "'because of' [his] race, color, or
> sex to withstand a motion to dismiss."
> (quoting *McCleary-Evans v. Md. Dep't of
> Transp.*, 780 F.3d 582, 584–85 (4th Cir. 2015)
> (quoting 42 U.S.C. § 2000e-2(a)(1)) (emphasis
> in *McCleary-Evans*).

*Castro v. Ikea Distrib. Servs., Inc.*, No. 24-CV-1074-BAH, 2025 WL 815407, at *4 (D.Md. Mar. 14, 2025).

Although Plaintiff has alleged that he is a member of a protected class and that he was terminated, Plaintiff has not plausibly alleged that he was terminated because of his race or other protected class membership. Other than self-identifying as "a middle-aged black man," Plaintiff did not include any facts that indicate that the store manager or the assistant store manager's unfriendly behavior was because of his membership in a protected class. Additionally, Plaintiff has not alleged any facts to show that Dennis, Shawn, or any other member of the company

17

involved in his termination terminated him because of his race or other protected class membership.

Plaintiff has also failed to identify any employees outside of the protected class who were engaged in or accused of similar issues with attendance, sharing of confidential information, and the lack of partnership with the store management team, and were not terminated. Additionally, although Plaintiff alleges that his position was filled with a new hire, Plaintiff does not allege that the new hire was outside the protected class. (ECF No. 28, at 3). Therefore, Plaintiff has failed to state a claim for discriminatory termination, and Defendant's motion to dismiss will be granted as to this claim.

### 2.    Title VII Retaliation

Plaintiff's amended complaint is not a model of clarity, but he seems to allege several instances of protected activity and retaliation. First, Plaintiff alleges that in July 2022, he emailed the corporate leaders and store manager about culture and management. Plaintiff seems to allege that following this encounter, Plaintiff had difficulty inputting his schedule, which ultimately caused issues with his attendance record. (ECF No. 25, at 8). Plaintiff also alleges that later in July, the store manager reported a fabricated incident to HR. (*Id.*). In his EEOC charge of discrimination, Plaintiff writes that he was subjected

18

to "exclusion and denial of working with staff," "false write ups," and "notes criticizing [his] performance." (ECF No. 25-1, at 2).

Plaintiff alleges that in November 2022, he emailed Dennis, Shawn, and HR complaining about the store manager and the discrimination of individuals with special needs. Plaintiff also alleges generally that the store manager undermined his work, and Plaintiff was "accused of discussing confidential information with employees." (ECF No. 25, at 10-11).

Plaintiff alleges that in around March 2023, Plaintiff emailed Dennis stating that he was "forced to file a complaint with the EEOC due to the hostile environment." (ECF No. 25, at 11). Throughout April, May, and June, the situation did not change, and in late June, Plaintiff mailed his complaint to the EEOC. (ECF No. 25, at 12). The next day, Dennis and Shawn called a meeting with Plaintiff and the store manager, but the issues were not resolved. On July 16, Dennis visited Plaintiff in Plaintiff's office and told Plaintiff he was being terminated. (*Id.*).

Defendant argues that Plaintiff fails to state a claim for retaliation because he does not allege that he engaged in a protected activity. (ECF No. 26-1, at 10). Defendant asserts that while Plaintiff alleges that he complained about discrimination of people with special needs, he does not allege

19

that he has special needs. (*Id.*). Additionally, Defendant argues that Plaintiff did not include enough facts about the "false write ups" or "notes criticizing his performance" to allege sufficiently that his complaints about them were protected activity. (ECF No. 26-1, at 10-11). Additionally, Defendant argues that even if Plaintiff's complaints were protected activity, he has not alleged facts to support causation between the complaints and his termination. Defendant points out that Plaintiff acknowledged that Defendant told him that he was "terminated because of [his] attendance, sharing of confidential information and the lack of partnership with the store management team." (ECF No. 26-1, at 11).

Plaintiff argues that "the treatment and experiences the Plaintiff received . . . shows the court that those events and the reporting of several rule violations establishes a clear nexus that the company not only wrongfully terminated Plaintiff but attempts to show that they failed to abide by their own disciplinary policy." (ECF No. 28, at 3). Plaintiff also reiterates that there was a meeting between himself, the store manager, and the district leaders on around June 29, 2023. (ECF No. 28, at 5). Plaintiff asserts that during the meeting, "only the store manager was allowed to respond" to the district leader's question, and then "the meeting ended suddenly." (*Id.*). Plaintiff

asserts he was terminated on around July 16, 2023.   (*Id.*).
Plaintiff asserts that he made complaints of "wrongdoing by the
store and the assistant store manager," no action was taken, and
he was then discharged.   (ECF No. 28, at 6).

Under Title VII, it is unlawful

> for an employer to discriminate against any of
> his employees . . . because he has opposed any
> practice made an unlawful employment practice
> by this subchapter, or because he has made a
> charge, testified, assisted, or participated
> in any manner in an investigation, proceeding,
> or hearing under this subchapter.

42 U.S.C. § 2000e-3.

To bring a retaliation claim, "a plaintiff must allege '(1)
engagement in a protected activity; (2) adverse employment action;
and (3) a causal link between the protected activity and the
employment action.'" *Manzanares v. Prudent Med. Assocs., LLC*, No.
21-CV-2241-DKC, 2022 WL 2176857, at *2 (D.Md. June 16, 2022)
(quoting *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir.
2010)).

**a.    Protected Activity**

> There are two categories of protected
> activity: participation and opposition.
> *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir.
> 2018) (Title VII). Participation includes "(1)
> making a charge; (2) testifying; (3)
> assisting; or (4) participating in any manner
> in an investigation, proceeding, or
> hearing[.]" *Laughlin v. Metro. Wash. Airports
> Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).
> Unlike opposition, participation is provided

> "absolute protection" against employment
> retaliation. *Netter*, 908 F.3d at 937. An
> employee only needs to allege that she filed
> a charge of discrimination to support the
> inference that she engaged in a protected
> activity. *See id.*

*Manzanares*, 2022 WL 2176857, at *2.

Plaintiff has alleged that he participated in protected activities by filing a charge of discrimination with the EEOC and lodging internal complaints. Although the exact timeline is unclear, Plaintiff alleges in at least one place that he emailed Dennis in around March 2023 stating that he was "forced to file a complaint with the EEOC due to the hostile environment." (ECF No. 25, at 11). He also alleges that he mailed a complaint to the EEOC in late June 2023. Filing a complaint with the EEOC and raising internal complaints are protected activities. *See Gaines v. Balt. Police Dep't*, 657 F.Supp.3d 708, 743 (D.Md. 2023) (citation omitted) ("[C]omplaints raised through internal company procedures are recognized as protected activity.").

### b.  **Adverse Action**

Defendant does not dispute that Plaintiff's termination constituted an adverse action. Additionally, Plaintiff alleges that he was subject to schedule changes that created issues with his attendance record, "exclusion and denial of working with staff," a false incident being reported to HR, "false write ups,"

and "notes criticizing [his] performance." (ECF Nos. 25, at 8; 25-1, at 2).

> [T]he adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." [] [*Strothers v. City of Laurel, Md.*, 895 F.3d 317, 327 (4th Cir. 2018)]] . . . Thus, "[t]he scope of Title VII's anti-retaliation provision . . . is broader than the anti-discrimination provision." *Strothers*, 895 F.3d at 327.
>
> Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern [& Santa Fe Ry. Co. v. White]*, 548 U.S. [53,] 67 [(2006)], 126 S.Ct. 2405; *see also Ray [v. Int'l Paper Co.]*, 909 F.3d [661,] [] 667 [(4th Cir. 2018)]. So, "retaliatory actions do have to be 'materially adverse'— such that they 'might have dissuaded a reasonable worker' from engaging in protected activity." *Strothers*, 895 F.3d at 327 (quoting *Burlington Northern*, 548 U.S. at 68, 126 S.Ct. 2405). . . .

G*aines*, 657 F.Supp.3d at 744. Some courts in this district have found that internal disciplinary actions such as an informal or formal reprimand do not constitute an adverse employment action. *See, e.g.*, *Gaines*, 657 F.Supp.3d at 744. Other courts have found that when considered together at the summary judgment stage, multiple disciplinary actions and negative evaluations can create a genuine dispute of material fact as to whether the actions are adverse. *See, e.g.*, *Howerton v. Bd. of Educ. of Prince George's Cnty.*, No. 14-CV-0242-TDC, 2015 WL 4994536, at *17 (D.Md. Aug. 19,

23

2015). At this stage, Plaintiff has shown multiple instances of disciplinary actions that, when taken together with his termination and construed liberally, constitute adverse actions.

### c. Causal Relationship

"[E]stablishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Gaines*, 657 F.Supp.3d at 745 (citations omitted). Indeed, "'[v]ery little evidence of a causal connection is required to establish a prima facie case [of retaliation].'" *Id.* (citations omitted).

> "A plaintiff may attempt to demonstrate that a protected activity caused an adverse action through two routes." *Johnson [v. United Parcel Serv., Inc.]*, 839 Fed.Appx. [781] [] 783-84 [(4th Cir. 2021)]. A plaintiff may establish the existence of facts that "suggest[ ] that the adverse action occurred because of the protected activity." *Id.* (citing *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (recognizing that "relevant evidence may be used to establish causation")). A plaintiff may also establish that "the adverse act bears sufficient temporal proximity to the protected activity." *Id.* (*citing Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)).

*Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021).

> While there is not a bright-line rule instructing when temporal proximity is sufficient to establish causation, without other evidence of causation, the gap between the protected activity and the adverse employment action can generally be no longer than two months. *See Roberts v. Glenn Indus.*

24

> *Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021).
> In any event, the plaintiff must show that a
> relevant decisionmaker was actually aware of
> the protected activity before making their
> decision. *See id.* at 124 (citing *Dowe v. Total
> Action Against Poverty in Roanoke Valley*, 145
> F.3d 653, 657 (4th Cir. 1998)). . . .
>
> However, even in the absence of temporal
> proximity, causation can be established
> through a pervasive sequence of intervening
> events indicating disdain for or intermeddling
> with the protected activity. *See e.g., Barbour
> v. Garland*, 105 F.4th 579, 593–94 (4th Cir.
> 2024); *Holloway v. Maryland*, 32 F.4th 293, 300
> (4th Cir. 2022) (causation established where
> supervisor told plaintiff that they "would be
> involved" in their EEO complaint); *Lettieri v.
> Equant Inc.*, 478 F.3d 640, 650–51 (4th Cir.
> 2007) (causation established where plaintiff
> was stripped of multiple job responsibilities
> before ultimately being fired for an
> illegitimate reason).

*Barnhill v. Bondi*, 138 F.4th 123, 132-33 (4th Cir. 2025).

Construing Plaintiff's allegations liberally, he has alleged causation, albeit narrowly. Plaintiff alleges temporal proximity because he states that he told Dennis in March 2023 that he filed a complaint with the EEOC, and around four months later, in July 2023, Dennis terminated Plaintiff. Although Plaintiff does not provide the exact timeline, he also seems to allege that following an internal report regarding the culture and management, he had difficulties with his schedule and was subjected to a false report to HR and a false write up later that month. Therefore, at this stage, taking the several month gap together with Plaintiff's

allegation that the decisionmaker had actual knowledge of his EEOC complaint, and together with the other incidents indicating disdain for Plaintiff's internal complaints, Plaintiff has stated a claim for retaliation under Title VII. Accordingly, Defendant's motion to dismiss will be denied as to this claim.

### 3. Failure to Prevent Hostile Work Environment

In his amended complaint, Plaintiff checked the box for "[o]ther acts" and wrote "[f]ailure to prevent hostile working environment." (ECF No. 25, at 4). Defendant did not address Plaintiff's hostile work environment in its motion to dismiss except as to the statute of limitations, contending later that Plaintiff had not made such a claim. (ECF No. 29, at 5). Plaintiff argues in his opposition in support of such a claim. In its reply, Defendant argues that Plaintiff fails to state a claim for hostile work environment because Plaintiff has not alleged facts that show he was "subjected to harassment on the basis of his race or any other protected trait," and he has not shown that any such harassment "was sufficiently severe or pervasive enough to alter the conditions of his employment or create an abusive atmosphere." (ECF No. 29, at 5-6).

Plaintiff argues that when determining whether a work environment is abusive, multiple factors should be taken into consideration, including psychological harm and whether the

26

conduct "unreasonably interferes with an employee's work performance." (ECF No. 28, at 5-6). Plaintiff seems to allege that the lack of communication with his team interfered with his work duties. (ECF No. 28, at 5). He also argues that the district leaders knowledge of the ongoing issues and failure to "offer[] real support" shows their "complicity . . . in creating the hostile work environment." (ECF No. 28, at 6).

There are four elements for a hostile work environment claim. "(1) the employee 'experienced unwelcome harassment,' (2) 'the harassment was based on [the employee's] . . . race,' (3) 'the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere,' and (4) 'there is some basis for imposing liability on the employer.'" *Renibe v. Univ. of Md., Coll. Park*, No. 22-CV-0618-DKC, 2023 WL 2585664, at *9 (D.Md. Mar. 21, 2023) (quoting *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003)).

In order to "satisfy the . . . severe or pervasive test," the plaintiff must "clear a high bar." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019) (internal quotation marks omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" are generally insufficient. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "Nor can a plaintiff state a hostile work environment claim by alleging

27

mere 'rude treatment by coworkers, callous behavior by . . . superiors,' or '[i]ncidents that would objectively give rise to bruised or wounded feelings.'" *Renibe*, 2023 WL 2585664, at *9 (quoting *Perkins*, 936 F.3d at 208 (cleaned up)).

Plaintiff's allegations do not meet this high standard. First, Plaintiff has not alleged that any harassment he experienced was based on his race. The only time Plaintiff mentions race in his amended complaint is to self-identify as "a middle-aged black man." (ECF No. 25, at 5). In his opposition, Plaintiff states that the "[a]lthough the company hire[s] many African American individuals, they are not represented in having a stake in the company." (ECF No. 28, at 3). He also reiterates his membership in a protected class by stating that he is "a middle-aged, outspoken African American male." (*Id.*). Additionally, Plaintiff acknowledges that previous employees had difficulties dealing with the store manager, and he does not allege that they were members of a protected class. Therefore, Plaintiff does not allege that the alleged harassment Plaintiff experienced was because of his race.[9]

Second, Plaintiff has not alleged that any harassment was "sufficiently severe or pervasive." Plaintiff alleges that the

---

[9] Plaintiff did not check the box on his amended complaint form for age discrimination, so his allegations of his age are not relevant for his discrimination claim.

store manager made a false report to HR, failed to meet with
Plaintiff as he was supposed to and overall failed to cooperate
with Plaintiff, interfered with Plaintiff's internal investigation
work, discriminated against people with special needs, was "stand-
off-ish," and said he will not work with Plaintiff.  Plaintiff
also alleges that the assistant store manager was "stand-off-ish"
and would "speak rudely and aggressively" to Plaintiff and tried
to find problems with him and report it to the store manager to
try and get Plaintiff terminated.  Although Plaintiff has alleged
that he was working in an unpleasant, discourteous, and frustrating
environment, "Title VII . . . does not 'guarantee a happy
workplace'—'only one free from unlawful discrimination.'" *Renibe*,
2023 WL 2585664, at *10 (quoting *Hartsell v. Duplex Prods., Inc.*,
123 F.3d 766, 773 (4th Cir. 1997)).  Therefore, Plaintiff has failed
to state a hostile work environment claim, and Defendant's motion
to dismiss will be granted as to this claim.

### C. State Law Claims

In his amended complaint form, Plaintiff checks the box for
"[r]elevant state law" and specifies that he is bringing a claim
under Md. Code Ann. State Gov't § 20-606(f)(2), the Maryland Fair
Employment Practices Act ("MFEPA").  In Plaintiff's opposition, he
also cites § 20-606(a)(5), which states that "[a]n employer may
not . . . engage in harassment of an employee."  Plaintiff alleges

that the store and assistant manager harassed Smith "at various levels." (ECF No. 28, at 6).

Plaintiff's harassment claim will not be considered because a plaintiff may not amend his or her complaint through motions briefing. *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy.")

Under the MFEPA, "[a]n employer may not discriminate or retaliate against any of its employees . . . because the individual has: (1) opposed any practice prohibited by this subtitle; or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subtitle." Md. Code Ann. State Gov't § 20-606(f).  "Title VII case law applies to the adjudication of FEPA claims." *Gaines*, 657 F.Supp.3d at 756 (first citing *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 914 A.2d 735 (2007); then citing *Linton v. Johns Hopkins Univ. Applied Physics Lab'y, LLC*, 10-276-JKB, 2011 WL 4549177 at *5, n.3 (D.Md. Sept. 28, 2011)). Because Plaintiff has stated a claim for retaliation under Title VII, Plaintiff has also stated a claim for retaliation under the MFEPA.  Accordingly, Defendant's motion to dismiss is denied as to this claim.

**IV.  Conclusion**

For the foregoing reasons, Defendant's motion to dismiss will be granted in part and denied in part.  A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

31